[Civ. No. 34990. Second Dist., Div. Five. Dec. 2, 1970.]

JAMES MINTZ et al., Plaintiffs and Respondents, v.
EDITH ROWITZ et al., Defendants and Appellants.

## COUNSEL

George McGill for Defendants and Appellants.

Yudelson & Lawton for Plaintiffs and Respondents.

## OPINION

**KAUS, P. J.**—Louis Mintz ("Louis") died on July 20, 1967. This appeal is from a judgment entered after a consolidated trial in four separate actions which resulted from Louis' alleged failure to keep a promise to his predeceased wife Bessie Mintz ("Bessie"), to dispose of his estate in a certain fashion. There is no need to set forth in detail just who sued whom for what. Common questions of law and fact underlie all four actions and it is not contended that the disposition of Louis' estate made in the judgment is erroneous if the trial court correctly decided the issues raised by this appeal.

### FACTS

When Louis and Bessie married, each was the parent of two children by a previous marriage. Louis' children were the respondent James Mintz, also sometimes known as Morris Mintz ("Morris") and the appellant Edith Rowitz ("Edith"). Bessie's children were respondents Jeanette Saidoff ("Jeanette") and Lester Myers ("Lester"). Together Louis and Bessie became the parents of the respondent Muriel Shur ("Muriel"). In 1952 Louis and Bessie went to see an attorney. There had been previous discussions concerning their estate. According to the attorney, whose testimony was admitted without objection, they did not trust each other and wanted to be sure that the last to die would not be able to revoke the disposition of the estate on which they had mutually agreed. In fact they wanted to die together in order to make sure that the survivor would not be able to change the terms of their agreement. The agreement, as explained to the attorney, was that the survivor was to have a life estate in their joint and community

property[1] and that the remainder was to be divided as follows: one-fourth of the personal property to Jeanette and Lester, one-half to Muriel and one-fourth to Morris and Edith. Three parcels of real property which Louis and Bessie owned in joint tenancy were to go as follows: a parcel known in this litigation as lot 221 to Jeanette and Lester, a parcel known as lot 5 to Muriel and a parcel known as lot 158 to Morris and Edith. The attorney then prepared wills for Louis and Bessie. Bessie was illiterate.

The wills were spectacularly unsuccessful in embodying Louis' and Bessie's desires.

Bessie's will did not even come close. It simply left her entire estate to Louis. Bessie would have died intestate, had Louis predeceased her. Her stepchildren would have inherited nothing.

Louis' will left his personal property to Bessie. It also gave her a life estate in lots 221, 5 and 158, with the remainder to the children as had been orally agreed.[2] The will made no disposition of Louis' personal property in the event that he survived Bessie. It did, however, provide that were he and Bessie to die together in a common accident, all personal property was to go to the five children in the proportions designated by the oral agreement. Thus if Louis survived Bessie, his stepchildren would have been left out as far as his personal property is concerned.

To sum up: the net effect of the two wills was that only in the event that Louis and Bessie died in a common accident would their contract be fulfilled.

The attorney further testified, still without objection, that according to the parties' agreement "upon Bessie's death the property was to go to Louis who was holding that property as a trustee for the children."[3] He was hard put to explain what part of either party's will put this understanding into effect.[4]

---

[1]The wills which resulted from the discussion each recite that all property, except property held in joint tenancy, is community property.

[2]As noted, the three parcels of real property then stood in joint tenancy and were therefore not subject to testamentary disposition by Louis in the event he predeceased Bessie. The attorney "may or may not have" explained this to his clients.

[3]"Q. Am I to understand, then, sir, that upon Bessie's death the property was to go to Louis who was holding that property as a trustee for the children? A. Yes, I would say so. Q. That he did not own the property during his lifetime after Bessie's death. A. Well, owned it as a trustee. Q. But that he did not have any beneficial right to that property. A. Except for whatever his immediate needs were, that's right."

[4]". . . Actually, there may or may not be anything particularly or specifically in the wills, but these people were trying hard to arrive at conclusions, and maybe some of these things were simply things that they said or agreed to and were going to do rather than have them in the will or have them in a document. I think that's probably some of my thinking. I can't remember specifically, for example, that he was to use

On May 7, 1952, the same day that the wills were executed, the parties signed an agreement to the effect that the wills "shall be and remain unchanged and shall not be revoked nor canceled nor changed by any later Will unless both of the parties agree in writing to such change."

On June 14, 1957, lot 221 was conveyed by Louis and Bessie as joint tenants to themselves and to Lester and Jeanette as joint tenants. On the same date lots 5 and 158 were conveyed by Louis and Bessie as joint tenants to themselves and to Muriel as joint tenants.[5]

In 1956, 1958 and shortly before Bessie's death in 1965, Louis opened savings accounts into which he placed substantial amounts of money. One account is in the name of Louis and Bessie as joint tenants. The other two are in Louis' name as trustee for Bessie.

On January 8, 1960, Louis established a "Totten trust" account in a savings and loan association with an initial deposit of $4,000. The payee named in the event of Louis' death was Edith. Bessie died on December 11, 1965. On January 6, 1966, Louis opened another $10,000 Totten trust account for Edith's benefit. On February 1, 1966, he made her a joint tenant as to a savings and loan investment certificate savings account with a balance of $10,000. There followed various other transfers of cash, checking and savings accounts from Louis to Edith. Some of these were confirmed in a document signed by Louis on April 20, 1967, which further recited that he had, on the same day, conveyed all of his interest to lots 158, 5 and 221[6] to Edith, as indeed he had. All of these transfers were described as gifts in consideration of Louis' love and affection for his daughter. Louis died on July 20, 1967. No distribution from Bessie's estate had ever been made to him.

As indicated at the outset there is no need to detail the pleadings in the four consolidated actions. The trial culminated in findings of fact which, in language appropriate to such a document, cover most of the matters heretofore related. The following findings are important to this appeal: (1) In addition to agreeing that their combined estate should go to the five children

---

only the rentals and leave the principal. This I don't recall as something that they came to or agreed to. But I do know that it was contemplated that he was to use whatever he wanted or needed for his own purposes. The balance then would go to the children."

[5]It will be noted that with respect to lot 158, the June 14, 1957, conveyance was inconsistent with the understanding that Louis and Bessie had expressed to their attorney. The trial court later so found. It also found that Bessie was "illiterate and could neither read nor write; and had no proper knowledge as to the effect of the grant deed [to lot 158] which grant was inconsistent with the provisions of the will of Louis Mintz and therefore could not give any effective consent thereto."

[6]The document erroneously described the parcel as "lot 21."

in the manner told to the attorney, Louis and Bessie agreed "(a) that their mutual wills would contain provisions which would suitably execute their agreed desires; (b) that the agreement for the making of mutual wills was intended and made for the express benefit of all of the persons named therein as beneficiaries without distinction as to whether said beneficiaries were the children of Louis or Bessie Mintz; (c) that neither Louis or Bessie Mintz could, after the death of the other, change the beneficiaries or in any way deprive them of the benefit of said agreement; (d) that the survivor of Louis and Bessie Mintz, during his or her lifetime, could have the reasonable use and enjoyment of their combined estates; and (e) that upon the death of the survivor their property would then pass to the persons named as beneficiaries as stated in the mutual wills and not otherwise." (2) The mutual wills executed on May 7 were a "written memorandum of this agreement" as was the contemporaneous agreement not to revoke the wills, (3) Relying on the relationship of trust and confidence which existed between her and Louis, and on his promise, Bessie did not revoke her will. (4) The June 14, 1957, deeds were delivered to Muriel for safekeeping several years after their execution.[7] It was only after that delivery that the children were informed of the transfers. (5) Edith established a special confidential relationship with Louis and on March 30, 1967, caused him to be removed from his home to her own residence. (6) When, on April 20, 1967, Edith caused Louis to execute and deliver the grant deeds to the three parcels, he was "enfeebled by age and had deteriorated mentally and physically and was entirely under" her control. The deeds were prepared by her attorney at her request. (7) The same was true of the April 20, 1967, memorandum confirming the gifts of money and property. Edith caused and assisted Louis to sign all four documents while Louis was propped up in bed; and (8) Edith, both before and after Louis' change of residence had caused him to transfer more than $30,000 into accounts which were in her name as trustee for her children. These transfers were in breach of Louis' agreement with Bessie.

From these findings the court drew the following conclusion, among others: (1) That the agreement between Louis and Bessie was in effect at all relevant times. (2) That the various transfers to Edith had been procured through fraud and undue influence and should be declared null and void. (3) That a constructive trust should be imposed on the assets and properties and disposed of in conformity with the basic 1952 agreement.

Appellant attacks the judgment on various grounds. It will be seen that her contentions are most easily refuted, if we first examine whether there

---

[7]All three deeds had been recorded on June 25, 1957.

is a basis, free from error, on which the judgment can be sustained. (*Brewer v. Simpson,* 53 Cal.2d 567, 583-584 [2 Cal.Rptr. 609, 349 P.2d 289].)

The fact situation presented to the court below is a classic. A husband and a wife make an oral agreement that on the death of the survivor their property is to go to certain heirs in designated proportions. After the death of the first spouse the survivor is to have a life estate in the property. One spouse dies without having made a testamentary disposition contrary to the mutual agreement. The second spouse then proceeds to make *inter vivos* or testamentary transfers in violation of the mutual promises exchanged between himself and the deceased spouse.

Of course the original agreement is not enforceable because of the provision in the statute of frauds relating to agreements to "devise or bequeath any property, or to make any provision for any person by will." (Civ. Code, § 1624, subd. 6.) This was clearly perceived by the trial court. By its findings, conclusions and judgment, that court sought to give effect to the oral contract on three different theories: 1. it indicated that such writings as were in evidence were a sufficient memorandum to comply with the statute; 2. it found that the gifts made to Edith were procured through fraud and undue influence;[8] and 3. it ordered quasi-specific performance of the oral agreement on the basis of estoppel.

It is this last theory which we find to be amply supported by the evidence. The leading California case is *Notten* v. *Mensing,* 3 Cal.2d 469 [45 P.2d 198]. That case reached the Supreme Court on appeal from a judgment entered after the defendant's demurrer was sustained without leave to amend. The plaintiffs had pleaded an oral agreement between John W. Notten and Carrie M. Notten, husband and wife, made in 1921, pursuant to which their estate should go to the survivor for life and then to two lines of collateral heirs. The effect of the agreement, but not the agreement itself, was embodied in mutual wills made at the same time. The husband died without having revoked his will. The wife survived him by about 10 years, leaving a will which did not mention the husband's relatives except as to insignificant amounts. The court held: 1. the 1921 agreement came within the statute of frauds; 2. had it been in writing it would be subject to "quasi-specific performance"; 3. the mere making of a will in accordance with the oral agreement was not a sufficient memorandum to satisfy the statute of frauds, since the will did not refer to the agreement; 4. death of one of the parties to the agreement and the survivor's acceptance of benefits to the deceased party's will, was not part performance to take the matter

---

[8]The parties recognize that voiding the gifts to Edith would not, in itself, accomplish the objective of the contract between Louis and Bessie. Louis would simply have died intestate with respect to his personal property.

out of the operation of the statute; but 5. ". . . There is a long line of authorities in this state to the effect that under the proper circumstances a party may be estopped to plead the statute of frauds. We are of the opinion that the facts pleaded in the complaint present a proper case for the application of that rule. ■ It is our opinion that when two parties execute reciprocal wills pursuant to an oral agreement, and one of the parties dies before either will is revoked, and the other party accepts the benefit of the decedent's will, and then revokes, a constructive fraud sufficient to raise the estoppel has been practiced on the first decedent and on the beneficiaries of the oral agreement." (*Notten* v. *Mensing, supra,* 3 Cal.2d at p. 474.)

■ The court further held that the type of fraud on which an estoppel to assert the statute of frauds may be based need not involve an actual intent to defraud or mislead. ". . . [A]ll that is required is that there exist 'a fraud inhering in the consequences of thus setting up the statute'. . . ." (*Notten* v. *Mensing, supra,* 3 Cal.2d at p. 476.) The judgment was reversed.[9]

In *Ryan* v. *Welte,* 87 Cal.App.2d 897 [198 P.2d 357], a similar case, it was emphasized that what gives rise to the estoppel is a change of position by the contracting parties. It is not necessary that any of the heirs do anything in reliance on the contract.

■ The main thrust of appellant's attack on the judgment based on the estoppel theory is that she claims that Louis never accepted any benefits under Bessie's will. In this connection she points out that at the time of Louis' death, no distribution of Bessie's estate had ever taken place.

We do not pause long to inspect the minor premise of Edith's syllogism. Subject only to administration, full title to Bessie's estate vested in Louis at the moment of her death. (Prob. Code, § 28; *Estate of Lefranc,* 38 Cal.2d 289, 297 [239 P.2d 617]; *Reed* v. *Hayward,* 23 Cal.2d 336, 340 [144 P.2d 561].) Besides, it appears that a good deal of the estate was not subject to administration and that Louis was disposing of some of it rather freely.[10]

Edith's major premise is no stronger. ■ We take it that it has been settled since *Monarco* v. *Lo Greco,* 35 Cal.2d 621 [220 P.2d 737] that either unjust enrichment or, alternatively, a change in position may be

---

[9]At a later trial the plaintiffs miserably failed to prove the allegations of their complaint. (*Notten* v. *Mensing,* 20 Cal.App.2d 694 [67 P.2d 734].)

[10]It is interesting to note that in *Day* v. *Greene,* 59 Cal.2d 404, 410-411 [29 Cal. Rptr. 785, 380 P.2d 385, 94 A.L.R.2d 802], the Supreme Court, in upholding a finding of estoppel to rely on the statute of frauds, emphasizes the unjust enrichment of the beneficiaries of the surviving spouse's bounty, rather than the unjust enrichment of the survivor.

the basis of the "unconscionable injury" which must underlie an estoppel to plead the statute.[11]

In *Di Salvo* v. *Bank of America,* 274 Cal.App.2d 351, 354-355 [78 Cal.Rptr. 838], a similar quasi-specific performance case based on an oral agreement, the requirement was expressly stated in the alternative: "The doctrine of estoppel is applied when an unconscionable injury would result from denying enforcement after one party has been induced to make a serious change in position in reliance on the contract *or* where unjust enrichment would result if a party who had received the benefits of the other's performance were allowed to invoke the statute." (Italics added.)

■ In the case at bar one thing that cannot be denied is that Bessie made no change in her testamentary disposition which, she thought, embodied the oral agreement. True, had Louis predeceased her and had she not made another will to put the 1952 agreement into effect, she would have died intestate with respect to the personal property and her stepchildren would not have received any of it. In such an event Morris and Edith would have had the same right to quasi-specific performance as we recognize in respondents.

Edith further points out that in view of the evident distrust between Louis and Bessie at the time of the 1952 agreement, it is hard to see how the court could find that she kept her will in force relying on a "relationship of trust and confidence," as well as Louis' promise.

It may be that the findings go too far in this respect. Bessie may have thought that given half a chance Louis would break his promise—as indeed he did. The point is that she received assurances, however mistaken, that the wills and the agreement not to revoke, would effect the devolution of the estate as the parties had agreed.[12] In any event, the court made no specific finding that Bessie distrusted Louis at the time of the 1952 agree-

---

[11]"The doctrine of estoppel to assert the statute of frauds has been consistently applied by the courts of this state to prevent fraud that would result from refusal to enforce oral contracts in certain circumstances. Such fraud may inhere in the unconscionable injury that would result from denying enforcement of the contract after one party has been induced by the other seriously to change his position in reliance on the contract [citations omitted] or in the unjust enrichment that would result if a party who has received the benefits of the other's performance were allowed to rely upon the statute. . . ." (*Monarco* v. *Lo Greco, supra,* 35 Cal.2d at pp. 623-624.)

[12]"Q. Do you recall your conversation with them relative to their desire to have—and.I am using your words—*a locked in thing?* A. This stands out more vividly than many other features of our discussion. Q. Can you relate what you recall of that aspect of your discussions? A. Well, particularly each didn't trust the other. This basically was the thing. And if they could come to some conclusion and make certain for all time and forever this would be carried out, that's the thing that they wanted. Basically, this is the— Q. Did they also discuss that that's what they wanted to do for all time and forever unless they themselves wanted to change it subsequently

ment. It may well have thought that the attorney who prepared the wills was not entirely candid in that respect. He was in a rather awkward position trying to justify the unjustifiable. The court may have felt that the distrust was something he either invented, or exaggerated, or had led himself to remember as an excuse for a botched job.

■ Edith claims that the joint tenancy conveyance of lot 158 made in 1957 and the establishment of the three savings accounts in 1956, 1958 and 1965 indicated that Louis and Bessie intended to "partially if not completely revoke the wills."

As far as the establishment of the bank accounts is concerned, Edith points to no evidence that Bessie knew anything about them. In any event, what was accomplished was simply that in case Bessie survived Louis, she would come into immediate possession of the funds which, under his will, she was to receive anyway. When, in fact, he survived her, he simply succeeded in similar fashion to the joint tenancy account and became entitled to the other two under her will.

Edith's point seems to hinge on the belief that if Louis and Bessie did anything which would prevent their property going to the beneficiaries of the 1952 agreement other than by way of the wills, this indicates an intent to rescind the agreement. We see no reason why this should be so. We know, of course, that with respect to the three parcels of real property they were not even subject to testamentary disposition except by the survivor.

■ With respect to the conveyance of lot 157 the trial court found, as noted, (see fn. 5, *supra*), that Bessie, because of her illiteracy, had never consented thereto. Edith attacks that finding as "erroneous as a matter of law," but does not say why. In any case, her theory that the deed making Muriel a joint tenant with Louis and Bessie was an ademption of lot 158 must fail because, as just noted, at no time were any of the three parcels of real property subject to testamentary disposition. To be sure, by naming Muriel as their joint tenant, Louis and Bessie violated that part of the 1952 agreement which was to the effect that lot 158 was to go to Morris and Edith.[13] Perhaps, contrary to the court's finding, Edith even consented thereto. There is no evidence, however, that by this 1957 deviation from

together? A. Actually I don't think there was much discussion about changing it. They were bound and determined to have it as of that time. They came to the conclusion this was the way it was to be." (Italics added.)

[13]It is, of course, immaterial that Bessie apparently died in the belief that the devolution of the three parcels of real property was to take place by way of testamentary disposition, rather than by virtue of their being held in joint tenancy. (See *Lake* v. *Jackson*, 191 Cal.App.2d 372, 376 [12 Cal.Rptr. 652].)

their mutually expressed intent five years earlier, Louis and Bessie intended to rescind their entire agreement.[14]

■ Finally Edith makes a very lengthy point that the trial court erroneously resorted to the testimony of the attorney who drew the 1952 wills to, as it were, rewrite them in accordance with the oral agreement then made.

We believe that Edith misunderstands the effect of the attorney's testimony and the action of the court below. The testimony simply established that the agreement was made, and that Bessie believed that the documents she then signed—the will and the agreement not to revoke—would insure that her wishes would be obeyed in the event she predeceased her husband. The court did not, as Edith seems to claim, rewrite the wills. The court may well have been in error in holding that the wills and the agreement not to revoke constituted a sufficient memorandum to satisfy the statute of frauds. (*Kobus* v. *San Diego Trust & Savings Bank,* 172 Cal.App.2d 574, 579-580 [342 P.2d 468].) Since that finding is unnecessary to uphold the judgment, we can ignore it.

■ The finding does, however, pose a problem in another way. The point is not raised by appellant, but we think it of sufficient importance to deal with it.

After finding what the terms of the oral agreement between Louis and Bessie were, the court found as follows: "10. On May 7, 1952 Louis and Bessie Mintz did concurrently execute mutual wills as a written memorandum of this agreement and did also execute on this same date a document called Agreement Not to Revoke Wills as a further memorandum showing their intent to enforce the aforesaid agreement.

"11. At the time the mutual wills and the Agreement Not to Revoke Wills was made and during the negotiations leading to the same, and at the time of the drafting and execution of these documents, both Louis and Bessie Mintz were represented and fully and independently advised by [their attorney]. The mutual wills and the agreement not to revoke were voluntarily executed by both Louis and Bessie Mintz in each other's presence and *with full knowledge and understanding on the part of each of them as to the contents and consequences thereof."* (Italics added.)

The emphasized portion of the last finding sounds rather startling in view of what has been said and of the court's action in this case. Literally read, it is irreconcilable with the result reached. Obviously if Bessie had "full knowledge and understanding" of the "contents and consequences" of the

---

[14]It should be noted that the judgment in this case declares that Muriel has no interest in lot 158 and that it is owned by Edith and Morris.

three documents, she would have known how wide of the mark they fell and that, if she predeceased Louis, their mutual objectives were not going to be realized. We must, however, construe the findings as a whole. (*Garrison* v. *Edward Brown & Sons,* 25 Cal.2d 473, 479 [154 P.2d 377]; *Zeibak* v. *Nasser,* 12 Cal.2d 1, 14-17 [82 P.2d 375].) Further, all uncertainties and ambiguities in the findings must be construed to support, rather than to defeat, the judgment. (*St. Julian* v. *Financial Indemnity Co.,* 273 Cal. App.2d 185, 195 [77 Cal.Rptr. 843].) Keeping these rules in mind it seems quite clear that what the court meant to say was that Louis and Bessie knew and understood the contents and consequences of the wills as viewed by the court in the previous finding, namely a written memorandum of their agreement. This is made quite clear by two paragraphs found under the court's "Conclusions of Law." They read as follows:

"1. That the wills of Bessie and Louis Mintz were operative at the time of their respective deaths, as was the agreement not to revoke wills, as was their prior oral agreement relative to the disposition of their property to all of the children of Bessie and Louis Mintz.

"2. That the intention and agreement of the parties was that the real and personal property belonging to Louis and Bessie Mintz was to be disposed of and distributed to the persons *and in the proportions named and set forth in Paragraph Fourth of the Last Will and Testament of Louis Mintz.*" (Italics added.)

The only persons and proportions set forth in the fourth paragraph of Louis' will, other than Bessie, are the beneficiaries of the 1952 agreement in the proportions agreed on. To be sure the gift to them is qualified by the phrase: "Should my wife, BESSIE MINTZ, and I die together in a common accident then. . . ." That phrase, however, is the phrase which the trial court apparently thought could be eliminated by construing the wills as a sufficient memorandum under the statute of frauds. Thus construed the finding is seen to be consistent with everything else that the trial court said and did.

The judgment is affirmed.

Aiso, J., and Reppy, J., concurred.