Filed 8/24/20  Marriage of Rosciszewski CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re the Marriage of JAN J. ROSCISZEWSKI and MARIA-MATSUMOTO-ROSCISZEWSKI. | |
| JAN J. ROSCISZEWSKI, Appellant, v. MARIA MATSUMOTO-ROSCISZEWSKI, Respondent. | D073691 (Super. Ct. No. D545054) |

APPEAL from a judgment of the Superior Court of San Diego County, David B. Oberholtzer, Judge.  Affirmed.

Stephen Temko for Respondent.

Niddrie Adams Fuller Singh and Victoria E. Fuller; Harris Ginsberg and Evan C. Itzkowitz for Appellant.

Jan J. Rosciszewski (Jan) appeals a judgment dividing certain assets on dissolution of his marriage to Maria Matsumoto-Rosciszewski (Maria).  On appeal, he contends the trial court erred by applying incorrect legal standards in determining whether particular interspousal transfers or transactions during their marriage were the result of Maria's undue

influence over him or his incapacity.  As explained in more detail *post*, we conclude, among other things, that the court did, in fact, apply the correct legal standards, including the factors set forth in Welfare and Institutions Code section 15610.70, subdivision (a), in determining whether Maria rebutted the presumption of undue influence regarding those transfers or transactions.

## FACTUAL AND PROCEDURAL BACKGROUND

Jan and Maria were both born in Poland.  Each subsequently moved to California.  Jan and Maria met in 1982 and married for the first time in 1992, when he was 63 years old and she was 35 years old.  During their marriage, Jan gave Maria many gifts, including an apartment building and a car.  After they separated seven months later, Jan sought the return of those gifts in their marital dissolution proceeding and a separate civil action, claiming they were made based on fraud and undue influence.  Maria ultimately prevailed for the most part, retaining the apartment building, car, and other gifts.

In 2010, toward the end of Jan's third marriage, he and Maria met again and became engaged to be married.  At that time, Jan, who has a Ph.D. in physics and had been employed in the defense industry, owned and managed many rental properties and actively engaged in stock trading.  In 2011, Jan had Maria take over the management of his rental properties, which business was known as "J.J.R. Rentals."  Although she did not receive a salary for her management work, Jan paid her living expenses.  During their engagement, Jan also gave Maria, among other things, $300,000, $210,000 for home repairs, earnings from his investment in Apple stock, and a new car.  Jan repeatedly asked Maria to marry him and they originally scheduled their wedding for December 2012.  However, because of Maria's

2

concerns about interference with their relationship by Jan's adult daughter, Anna Fuchs (Anna), their wedding was postponed.

On January 7, 2013, Jan suffered a stroke, was hospitalized, and was later transferred to a rehabilitation facility for about one month. On January 18, while Jan was at the rehabilitation facility, Maria announced that she and Jan intended to get married at once. In response, Jan's treating physician requested a psychiatric consultation for Jan. Later that day, Dr. Heywood Zeidman, a psychiatrist, assessed Jan's competency and concluded he had the capacity to marry, but nevertheless advised him to wait several weeks because the stress of a wedding might hinder his recovery.

On January 19, Jan, then 83 years old, and Maria got married at the rehabilitation facility. A videotape of the wedding ceremony showed Jan was alert, fully participating, and appearing quite pleased.

In 2013, Jan estimated his net worth to be over $100 million, although the trial court later estimated that it probably was closer to $60 million. His primary assets consisted of his many rental properties, his stock portfolio with TD Ameritrade, and an $11 million Pacific Palisades house, known as the "Palace," which Anna managed and rented out for events. Jan devoted much of his time to trading stocks. Even while at the rehabilitation facility after his stroke, he arose at 6:00 a.m. each day, logged onto his laptop to check his TD Ameritrade account, and watched financial channels on television. Jan primarily traded stock options, leveraging his equity and taking enormous risks while executing sophisticated hedges and strangles. On January 1, 2013, 75 percent of his stock portfolio was invested in options. In particular, he invested heavily in options for Apple stock, so that a change of only a few dollars in the price of Apple shares would result in a change of hundreds of thousands of dollars in the value of his leveraged Apple options.

3

Those fluctuations in the stock market had an amplified effect on the current value of his stock portfolio and, as a result, his particular mood at the time.

During his marriage to Maria, Jan made several transactions transferring money and real property to her. On January 20, 2013, Jan transferred $300,000 from his TD Ameritrade account to her separate account, which transfer apparently was the first half of a wedding gift to her. As they had discussed before their wedding, on January 23, Jan also signed quitclaim deeds prepared by his attorney, transferring two apartment buildings to Maria as a wedding gift to her.

On February 1, Jan and Maria met with Michael Patton, a real estate agent, at Jan's rehabilitation facility to discuss their possible purchase of a home on Inspiration Drive in La Jolla. Jan wanted to buy a house in which he, Maria, and her son could live and in which Maria could live after his death. At that meeting, Jan signed an "all-cash" offer to purchase the Inspiration house for $3.9 million.

On February 8, after Jan was released from the rehabilitation facility, Jan, Maria, and her son met Patton at the Inspiration house. They toured the house for two-and-one-half to three hours. On February 20, escrow closed on their purchase of the Inspiration house, with Jan and Maria taking title as joint tenants.

On July 22, Jan signed a quitclaim deed transferring his interest in the Inspiration house to Maria, as her sole and separate property. Jan's quitclaim deed was his gift to Maria for her "Name Day," which is celebrated in Poland like a birthday.

Jan also made three large transfers of funds to Maria from his TD Ameritrade accounts. On May 28, he transferred $1 million to Maria's separate account. On June 18, he transferred $137,000 to Maria's separate

4

account.  On June 21, he transferred $1.25 million to Maria's separate account.  In August, after Anna learned of those transfers, she took Jan to the TD Ameritrade office where he obtained copies of the transfer documents and he then accused Maria of stealing those transferred funds.  Maria explained to him that the three transfers had been gifts to her.  On August 25, Jan purchased roses for Maria and placed the vase next to the three transfer forms with his signed handwritten note, stating:  "8/25/13 [¶] Money are [sic] a gift to Maria Matsumoto."

The dynamics of the interpersonal relationships among Jan, Maria, and Anna led to the demise of Jan's and Maria's second marriage.[1]  In particular, Anna told Jan that Maria was going to steal his money and was mismanaging his rental properties.  Anna involved her children in those discussions and once told Jan that she and her children would be "on the street" when he died.  Anna pressured Jan to leave Maria.  Meanwhile, Jan used his money as leverage with Anna.  On January 28, 2013, Jan and Maria argued over Anna's interference with their relationship and Maria reminded him of his promise to stop Anna's intermeddling and questioned whether their marriage was a good idea.  Later that evening, Jan left Maria a voice mail message, stating in part that he was "sorry for everything . . . cannot fight on two sides and to fight with my daughter and you. . . .  I am not strong

---

[1]     As the trial court set forth in its statement of decision, there were many incidents involving Anna's attempts to undermine Jan's marriage to Maria and to interfere with his transfers to Maria of his money or property or control over it.  However, we need not specifically discuss each incident in addressing Jan's contentions on appeal.  Rather, we primarily focus on the evidence at trial relevant to the issues of undue influence and capacity that may have affected Jan's transfers to Maria and the trial court's understanding and application of the correct principles of law in deciding those issues.

enough to fight with [Anna]." In that message, he reaffirmed his intent to buy the Inspiration house if Maria so wished.

While Jan was at the rehabilitation facility, a social worker observed the tension between Maria and Anna, which appeared to be regarding money, and was told Maria was bringing in a lot of papers for Jan to sign. The social worker reported to Adult Protective Services (APS) that Maria was trying to gain control of Jan's assets. On January 28, 2013, Michael Wear, an APS investigator, interviewed Jan and concluded that undue influence did not appear to be a factor and that Jan appeared to possess mental capacity with no cognitive or mental impairment. Jan told Wear that his marriage to Maria was "already on the rocks" because Maria felt he was not protecting her from Anna. Jan consistently told Wear that he was not coerced and his transfers to Maria were voluntary. Wear concluded the complaint was "unfounded."[2]

After Jan was released from the rehabilitation facility in February, he moved into Maria's home where she had made space in her living room for his bed and physical therapy there. When Anna faxed to Maria her advice on Jan's care, Jan replied that he was "getting excellent care—please do not interfere." In March, Anna took Jan to see an attorney, who then drafted a petition for Jan to divorce Maria. However, Jan apparently did not want to

---

[2]    At trial, Wear testified that he later changed his finding to "inconclusive," based on numerous telephone calls from Anna alleging that Maria was preventing her from contacting Jan and Dr. Zeidman's statement to him that Jan was competent to make bad decisions but that Maria was exploiting Jan's fear of being alone. The trial court concluded that Wear's initial finding of "unfounded" was more accurate.

6

leave his marriage to Maria.[3] In April, Jan referred to Anna as the Gestapo, but later apologized. After Anna apparently called Maria a whore in Polish, Jan demanded that she write a letter of apology to Maria. In May, Jan wrote a letter to Anna, asking her to respect his marriage to Maria and not to force an annulment on him or call police and stating Maria was providing him with excellent care. His letter also stated that if Anna did not respect his wishes, he would not transfer any more money to her.[4]

Jan and Maria separated on September 13, 2013. On September 19, Jan filed a petition for dissolution of their marriage. On July 25, 2017, after a 43-day bench trial, the court issued a 53-page statement of decision, as discussed in more detail *post*, setting forth its findings regarding specific transfers made by Jan to Maria that he challenged on grounds of undue influence or his alleged incapacity. In particular, the court found: "Jan had the capacity to understand what he was doing, did understand, and made each transfer of his own free will." On January 12, 2018, the court entered its judgment dividing the parties' assets and awarding attorney fees to Maria. Jan timely filed a notice of appeal challenging the judgment.[5]

---

[3]    At trial, the court stated that the weight of the evidence did not support Anna's testimony that an annulment of Jan's marriage to Maria was his idea from the beginning. On the contrary, the court found that the testimony of the disinterested witnesses showed otherwise. In particular, the court noted the testimony of a rehabilitation nurse assistant who stated that Maria was loving and attentive to Jan.

[4]    Anna later described Jan's letter as his "letter of betrayal."

[5]    On May 21, 2019, the parties submitted a stipulation agreeing to limit the exhibits for our consideration on appeal to only those exhibits admitted in evidence at trial. Because the other exhibits that were marked or otherwise identified, but not admitted in evidence, are irrelevant and immaterial to the issues on appeal, we accept the parties' stipulation.

DISCUSSION

I

*General Principles of Appellate Review*

"A judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness." (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133 (*Arceneaux*).) In *Denham v. Superior Court* (1970) 2 Cal.3d 557 (*Denham*), the court stated:

> "[I]t is settled that: 'A judgment or order of the lower court is *presumed correct*. All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown [by the appellant]. This is not only a general principle of appellate practice but an ingredient of the constitutional doctrine of reversible error.'" (*Id*. at p. 564.)

Therefore, we resolve any ambiguity in the record in favor of the judgment. (*Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 631 (*Winograd*).) "The burden of affirmatively demonstrating error is on the appellant." (*Fundamental Investment etc. Realty Fund v. Gradow* (1994) 28 Cal.App.4th 966, 971 (*Fundamental Investment*).)

"No rule of decision is better or more firmly established by authority, nor one resting upon a sounder basis of reason and propriety, than that a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason. If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion." (*Davey v. Southern Pacific Co.* (1897) 116 Cal. 325, 329.) "Because we review the correctness of the judgment, and not the court's reasons, we must affirm the judgment if it can be supported on any legal theory, *even if the trial court misapplied or*

8

*misunderstood the law.*" (*Aguayo v. Amaro* (2013) 213 Cal.App.4th 1102, 1115 (*Aguayo*), italics added.) Accordingly, we generally will affirm a judgment if it can be supported on any legal theory and will not reverse the judgment simply because a trial court's statement of decision indicates the judgment was based on a misunderstanding or misapplication of the law. (*Rappleyea v. Campbell* (1994) 8 Cal.4th 975, 980-981 (*Rappleyea*); *Hoover v. American Income Life Ins. Co.* (2012) 206 Cal.App.4th 1193, 1201) "If the decision itself is correct, there can be no prejudicial error from incorrect logic or reasoning." (*Id.* at p. 1201.)

However, there is a line of cases holding that the above general rule does not apply where "the appellate focus is on the *means* used by the trial court" and the appellant asserts that an incorrect process led to the challenged judgment. (*Clothesrigger, Inc. v. GTE Corp.* (1987) 191 Cal.App.3d 605, 611 (*Clothesrigger, Inc.*); see, e.g., *Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1022, 1050 (*Brinker Restaurant Corp.*) [if trial court considered improper criteria or made erroneous legal assumptions in exercising its discretion to grant or deny class certification, order must be reversed]; *Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 435-436 (*Linder*) [same]; *Ayala v. Antelope Valley Newspapers, Inc.* (2014) 59 Cal.4th 522, 530 (*Ayala*) [same]; *People v. Fuhrman* (1997) 16 Cal.4th 930, 944 (*Fuhrman*) ["[W]here the record affirmatively discloses that the trial court misunderstood the scope of its discretion, remand to the trial court is required to permit that court to impose sentence with full awareness of its discretion . . . ."]; *F.T. v. L.J.* (2011) 194 Cal.App.4th 1, 16 (*F.T.*) ["If the record affirmatively shows the trial court misunderstood the proper scope of its discretion," such as "the application of improper criteria or incorrect legal assumptions," its order is not an exercise of *informed* discretion and must be

9

reversed to allow the trial court on remand "to exercise informed discretion with awareness of the full scope of its discretion and applicable law."].) "To the extent that it appears the trial court's decision was based on improper criteria or rests upon erroneous legal assumptions, these are questions of law warranting our independent review." (*Wershba v. Apple Computer, Inc.* (2001) 91 Cal.App.4th 224, 235.)

Nevertheless, that exception to the general rule applies only where the record affirmatively shows the court misunderstood or misapplied the law. (*Fuhrman, supra,* 16 Cal.4th at p. 944; *F.T., supra,* 194 Cal.App.4th at p. 16.) On appeal, we presume the trial court "performed its duties in a regular and correct manner absent a clear showing to the contrary." (*In re Marriage of Fransen* (1983) 142 Cal.App.3d 419, 424 (*Fransen*); see also *In re Marriage of Smith* (1990) 225 Cal.App.3d 469, 494 (*Smith*).) Because on appeal we presume a judgment is correct, we "presume[] that the court followed the law." (*Wilson v. Sunshine Meat & Liquor Co.* (1983) 34 Cal.3d 554, 563 (*Wilson*).) Therefore, "[t]he mere fact that the court did not explicitly refer to [an applicable rule or the factors listed therein] . . . does not support the conclusion that it was ignored." (*Ibid.*; see also *San Ramon Valley Unified School Dist. v. Wheatley-Jacobsen, Inc.* (1985) 175 Cal.App.3d 1050, 1056 (*San Ramon Valley*); *Dubois v. Corroon & Black Corp.* (1993) 12 Cal.App.4th 1689, 1696 (*Dubois*) ["[T]he court is presumed to be correct in its ruling and need not specifically state that it has considered all of the relevant factors enunciated in the rule. . . ."].) Unless express findings are required, "we presume the court followed the law in making its determination [citation], including a consideration of the criteria set forth in [an applicable rule]." (*Landry v. Berryessa Union School Dist.* (1995) 39 Cal.App.4th 691, 698-699 (*Landry*).) In *Dubois,* the court stated: "Although the court did not render

10

express findings on the factors delineated in the rule, and although it may be desirable that a court do so, there is no such mandate in the law. 'The mere fact that the court did not explicitly refer to [the rule], when the statute contains no such requirement does not support the conclusion that it was ignored.' [Citation.]" (*Dubois*, at pp. 1698-1699, fn. omitted.)

II

*General Principles of Marital Property*

"In a marital dissolution proceeding, a court's characterization of the parties' property—as community property or separate property—determines the division of the property between the spouses. [Citations.] Property that a spouse acquired before the marriage is that spouse's separate property. (Fam. Code, § 770, subd. (a)(1).) Property that a spouse acquired during the marriage is community property (*id.*, § 760) unless it is (1) traceable to a separate property source [citations], (2) acquired by gift or bequest (Fam. Code, § 770, subd. (a)(2)), or (3) earned or accumulated while the spouses are living separate and apart (*id.*, § 771, subd. (a)). A spouse's claim that property acquired during a marriage is separate property must be proven by a preponderance of the evidence. [Citations.]" (*In re Marriage of Valli* (2014) 58 Cal.4th 1396, 1399-1400 (*Valli*).)

"A transmutation is an interspousal transaction or agreement that works a change in the character of the property." (*In re Marriage of Campbell* (1999) 74 Cal.App.4th 1058, 1062.) "Married persons may, through a transfer or an agreement, transmute—that is, change—the character of property from community to separate or from separate to community. (Fam. Code, § 850.) A transmutation of property, however, 'is not valid unless made in writing by an express declaration that is made, joined in, consented to, or accepted by the spouse whose interest in the property is adversely affected.'

11

(*Id.*, § 852, subd. (a).) To satisfy the requirement of an 'express declaration,' a writing signed by the adversely affected spouse must expressly state that the character or ownership of the property at issue is being changed. [Citation.]" (*Valli, supra,* 58 Cal.4th at p. 1400.)

Family Code section 852[6] "requires formalities to increase certainty that a transmutation occurred." (*In re Marriage of Bonvino* (2015) 241 Cal.App.4th 1411, 1428.) Section 852's requirement of an "express declaration" does not require use of specific terms or language, such as "transmutation," "community property," or "separate property." (*In re Marriage of Starkman* (2005) 129 Cal.App.4th 659, 664.) Nevertheless, "the writing must reflect a transmutation on its face . . . ." (*In re Marriage of Benson* (2005) 36 Cal.4th 1096, 1106-1107.)

"[I]nterspousal transactions must comport with the rules controlling the actions of persons occupying confidential relations with each other." (*In re Marriage of Haines* (1995) 33 Cal.App.4th 277, 293 (*Haines*).) Section 721, subdivision (a) provides that "either spouse may enter into any transaction with the other" spouse regarding property. Section 721, subdivision (b) generally provides that "in transactions between themselves, spouses are subject to the general rules governing fiduciary relationships that control the actions of persons occupying *confidential relations* with each other. This confidential relationship imposes a duty of the highest good faith and fair dealing on each spouse, and neither shall take any *unfair advantage* of the other. This confidential relationship is a fiduciary relationship subject to the same rights and duties of nonmarital business partners . . . ." (Italics added.) Accordingly, "when any interspousal transaction advantages one spouse to

---

[6]    All statutory references are to the Family Code unless otherwise specified.

the disadvantage of the other, the *presumption* arises that such transaction was the result of *undue influence*." (*In re Marriage of Delaney* (2001) 111 Cal.App.4th 991, 996, italics added; see also *Haines*, at p. 287 ["Under California community property law, because spouses occupy confidential relations with each other, when an interspousal transaction advantages one spouse over the other, a presumption of undue influence arises."].) "[A] presumption of undue influence arises only if one of the spouses has obtained an *unfair* advantage over the other." (*In re Marriage of Burkle* (2006) 139 Cal.App.4th 712, 732 (*Burkle*).) Therefore, "whenever [married] parties enter into an agreement in which one party gains an advantage, the advantaged party bears the burden of demonstrating that the agreement was not obtained through undue influence . . . ." (*In re Marriage of Bonds* (2000) 24 Cal.4th 1, 27.)

To rebut that presumption of undue influence, the burden is on the spouse obtaining the advantage or benefit "to prove the [transfer or other transaction] 'was freely and voluntarily made, and with a full knowledge of all the facts, and with a complete understanding of the effect of the transfer.' [Citation.]" (*Haines*, *supra*, 33 Cal.App.4th at p. 296, quoting *Brown v. Canadian Indus. Alcohol Co.* (1930) 209 Cal. 596, 598; see also *In re Marriage of Mathews* (2005) 133 Cal.App.4th 624, 630.) The advantaged spouse must "overcome that presumption [of undue influence] by a preponderance of the evidence." (*In re Marriage of Starr* (2010) 189 Cal.App.4th 277, 281; see also *Mathews*, at p. 631.) The question "whether the spouse gaining an advantage has overcome the presumption of undue influence is a question for the trier of fact, whose decision will not be reversed on appeal if supported by substantial evidence." (*Mathews*, at p. 632; see also *Burkle, supra,* 139 Cal.App.4th at p. 734.) Although the Family Code does not define "undue influence," the

13

California Supreme Court has described that term in the context of a testamentary disposition of property by will or trust as "pressure brought to bear directly on the testamentary act, sufficient to overcome the testator's free will, amounting in effect to coercion destroying the testator's free agency." (*Rice v. Clark* (2002) 28 Cal.4th 89, 96, quoted in *Lintz v. Lintz* (2014) 222 Cal.App.4th 1346, 1354 (*Lintz*).) "Direct evidence as to undue influence is rarely obtainable and hence a court or jury must determine the issue of undue influence by inferences drawn from all the facts and circumstances." (*Estate of Hannam* (1951) 106 Cal.App.2d 782, 786, quoted in *Lintz*, at p. 1355.)

Although on appeal we generally review a trial court's finding that a particular asset is separate or community property for substantial evidence to support that finding, "de novo review is appropriate where resolution of 'the issue of the characterization to be given (as separate or community property) . . . requires a critical consideration, in a factual context, of legal principles and their underlying values, the determination in question amounts to the resolution of a mixed question of law and fact that is predominantly one of law.' [Citations.]" (*In re Marriage of Rossin* (2009) 172 Cal.App.4th 725, 734.)

III

*Trial Court Correctly Applied the Law on Undue Influence*

Jan asserts the trial court erred by applying incorrect legal standards in determining whether particular interspousal transfers or transactions during their marriage were the result of Maria's undue influence over him. Importantly, he does *not* assert there is insufficient evidence to support the court's findings. Based on our review of the court's statement of decision, we conclude that the court did, in fact, apply the correct legal standards,

14

including the factors set forth in Welfare and Institutions Code section 15610.70, subdivision (a), in determining whether Maria rebutted the presumption of undue influence regarding those transfers or transactions.

A

*Statement of decision.* In its lengthy statement of decision, the trial court carefully and thoughtfully described the evidence admitted at trial, discussed applicable law, and set forth its findings of fact regarding certain transfers or transactions challenged by Jan. The court described the purposes of the trial as being whether Jan's transfers to Maria of real property and money were valid transmutations or invalid because of undue influence and whether he was entitled to any reimbursements. Based on its consideration of the evidence, the court generally found: "In viewing the details of each transaction, the court . . . concludes by a preponderance of the evidence *Jan had the capacity to understand what he was doing, did understand, and made each transfer of his own free will.*" (Italics added.)

After briefly discussing its weighing of the credibility of the primary witnesses, the court described Jan's wealth and relationship with his daughter, Anna. It also described certain transfers made by Jan to Maria and Anna during 2011 and 2012, finding that Jan's and Maria's January 2013 marriage "was not the beginning of Jan's transferring his assets—he had just gifted over $4.0 million to Anna in December 2012, anticipating the gift tax exemption would expire. The object of those transfers shifted from his daughter [Anna] to his wife [Maria], however." Addressing the transfers made by Jan to Maria in late January 2013 when he was at the rehabilitation facility, the court initially found that his transfer of $300,000 to Maria's separate TD Ameritrade account on January 20 was *not* an effective transmutation under section 852, subdivision (a) and the *Haines* standard. It

15

disallowed that transfer, finding that Maria had not rebutted the presumption of undue influence.

Addressing Jan's transfers to Maria of the two apartment buildings on January 23, the court noted that he signed quitclaim deeds prepared by his attorney, Michele Tutoli, and notarized by her assistant. Before he signed the deeds, Jan had requested that Tutoli prepare the quitclaims deeds, consulted with her, and discussed with her the effect the transfers would have. The court found: "Jan made these transfers freely, knowingly, with full knowledge of the facts and a complete understanding of what he was doing, satisfying the *Haines* rebuttal of undue influence." Finding that Jan had made a valid transmutation of the two apartment buildings to Maria, the court awarded Maria those properties as her sole and separate properties.[7]

The court also described testimony by Wear, the APS investigator, who, as discussed *ante*, interviewed Jan on January 28 and initially concluded that "[u]ndue influence was not an apparent factor" and that Jan "appears to possess mental capacity, confirmed by hospital staff." He noted that Jan never deviated from his statement that his transfers to Maria were voluntary. He found that Jan was "lucidly conversational and oriented," showed no cognitive impairment, and insisted that he was not coerced. Wear initially concluded that the complaints about Jan were "unfounded." He subsequently changed his conclusion to "inconclusive" based on information from Anna and Dr. Zeidman, which information Wear assumed was correct. However, the court found that Anna's claim that Maria isolated Jan from her

_____

[7]     Because Jan had separately paid off the $29,419 balance of a mortgage on one of the properties during their marriage and Maria had not rebutted the presumption of undue influence under section 852, subdivision (a) and *Haines* for that payment, the court ordered Maria to reimburse Jan for that amount.

16

and others to be not true and that it was questionable whether Dr. Zeidman was in a position to know whether Maria was exploiting Jan's fear of being alone. Based thereon, the court found Wear's initial "unfounded" conclusion was "more correct."

Addressing Jan's transfer to Maria of the Inspiration house, the court noted that Jan and Maria made an all-cash offer to buy the house for $3.9 million on February 1, toured the house on February 8, and closed escrow on February 20, taking title as joint tenants. The purchase money came from Jan's TD Ameritrade accounts. The court found Patton's testimony to be credible. Patton testified that during the initial February 1 meeting at the rehabilitation facility, Jan was engaged, interested, and asked questions regarding applicable codes, lot line restrictions, and homeowners' associations. Both Patton and his wife, a nurse, agreed that Jan was not impaired in any way. Although on February 4 Jan had second thoughts about buying the house, the court found his concerns were caused by a drop in the price of Apple stock and information that he owed a lot of taxes. However, that evening, Maria spoke to Jan and he realized that he had $18 million in cash and could therefore both buy the house and pay his taxes. Jan thereafter transferred an additional $3 million toward the house fund. Patton testified that on February 8, when Jan and Maria toured the Inspiration house, Jan was more engaged than a normal buyer. Jan discussed their plans to remodel the house. He also reviewed blueprints for the property provided by the seller. Jan appeared astute and sharp and his questions were more sophisticated than the average buyer's questions.

After escrow closed on their purchase of the Inspiration house, Maria asked her attorney, Stephen Green, to prepare a "Residence Agreement," pursuant to which Jan would be obligated to pay all expenses associated with

17

the house. On July 13, Jan signed that agreement. On July 22, Jan signed a quitclaim deed that, according to Maria, she had typed at his direction. Jan signed the quitclaim deed as a gift to Maria for her "Name Day."[8] Jan had previously discussed with his attorney, Olga Nazimova, his plan to give the Inspiration house to Maria and the Palace to Anna. Nazimova testified that he had asked her to review the quitclaim deed and whether it was correct. When Nazimova commented that it was a "nice gift," Jan smiled.

The court found that "[t]he weight of the evidence is Jan did intend at the time [i.e., on July 22, 2013] to give Maria the [Inspiration] house as her separate property; he simply regrets it now." The court further found that "Maria has offered sufficient evidence to overcome the *Haines* presumption regarding the Inspiration quitclaim deed. Jan was a sophisticated real estate investor and well understood the meaning of a quitclaim deed." The court concluded: "The quitclaim deed does comply with [section] 852[, subdivision] (a), and cuts off that right [to reimbursement] however, by transmuting Inspiration to Maria's separate property and moving the reimbursement claim to [section] 2640[, subdivision] (c), which precludes reimbursement." Accordingly, the court confirmed that the Inspiration house was Maria's sole and separate property. On the other hand, the court set aside the Residence Agreement, finding that Maria had not presented sufficient evidence to overcome the presumption of undue influence for that transaction.

The court also addressed certain transfers of cash by Jan to Maria, finding, inter alia, that he was entitled to a $773,554 credit toward Maria's attorney fees claim, but not for $295,000 that was used for family expenses. The court also discussed the interrelationships and disputes among Jan,

_____

[8]     Five witnesses testified that Jan bragged about the gift to Maria and that he was quite pleased with it.

18

Maria, and Anna after Jan was released from the rehabilitation facility. In particular, the court noted that on May 19, Anna planned to pick up Jan at a restaurant and, when she saw Maria with him, incorrectly assumed that Maria would be accompanying them. The court described the incident as follows: "Enraged, Anna got back in her car and drove right past Jan, who was waiting for her at the curb [in his wheelchair]. When telephoned to ask why she was leaving, Anna told her father to die, adding an expletive. After that Jan refused to speak to Anna for two weeks."

On Memorial Day 2013, Anna and her children arrived at Maria's home to visit Jan without calling ahead. Jan declined to let Anna in the house, but allowed the children and their nanny to come inside. While there, the nanny handed Jan a handwritten letter from Anna. Later, Jan and Maria read the five-page "tirade," as the court described it. In her letter, Anna accused Maria of not allowing her any contact with Jan, "orchestrating" the unpleasantness at the restaurant, and turning Jan into a "cruel and heartless" father to her. Anna also called Jan a "lying dog" for stating Anna had forced on him the proposed annulment of his marriage to Maria. On reading the letter, Maria became upset and Jan then told her not to worry and that he would secure her position as his wife. Thereafter, Jan made transfers in the amounts of $1 million, $137,000, and $1.25 million, totaling

19

$2.387 million, from his TD Ameritrade account to Maria's separate account.[9]

In August 2013, Anna learned about the three transfers made by Jan to Maria. After Anna took Jan to the TD Ameritrade office where he obtained copies of the transfer documents, Jan accused Maria of stealing those transferred funds. Maria explained to him that the three transfers had been gifts to her. On August 25, Jan purchased roses for Maria and placed the vase next to the three transfer forms with his signed handwritten note, stating: "8/25/13 [¶] Money are [sic] a gift to Maria Matsumoto." Although the court found that the original forms for the three transfers were not valid transmutations under section 852, subdivision (a), it found that Jan's subsequent handwritten note to Maria constituted a valid transmutation and unequivocally showed his intent to make those transfers a gift to her. It further found that Maria overcame the presumption of undue influence because the evidence showed that for two days Jan thought about Anna's allegation that Maria had stolen the money or obtained it through undue influence and nevertheless decided that money should go to Maria. The court found that Jan "knew what he was doing and understood the consequences." Accordingly, the court confirmed that the $2,387,000 total amount transferred to Maria's account was her sole and separate property.

---

[9] To provide context, the court also described a new family trust that Jan and Lisa Frisella, his attorney, worked on during June and July 2013. On July 3, Jan signed the new trust that made Maria a successor trustee, rather than a co-trustee. Because Jan had promised Maria that she would be a co-trustee, Maria had Green prepare amendments to the trust that made Maria a co-trustee, and Jan signed those amendments on July 17. However, after Jan and Maria separated, Jan revoked the trust. Accordingly, the court did not make any findings about the trust.

Addressing the issue of undue influence and Jan's related claim of elder abuse, the court noted that Jan asked it to find that Maria exercised undue influence over him as defined by Welfare and Institutions Code section 15610.70, subdivision (a), which is part of the Elder Abuse and Dependent Adult Civil Protection Act (EADACPA) (Welf. & Inst. Code, § 15600 et seq.), and defines "undue influence" as excessive persuasion that overcomes a person's free will and results in inequity. Although Jan asked the court to find Maria engaged in elder abuse under the EADACPA, he did not request any relief under that statute. The court stated:

> "[California Rules of Court,] [r]ule 5.17 states a court in a family law proceeding can only 'make orders against or involving the other party . . . available to the party in these rules . . . or other sections of the California Family Code.' A fair reading of [Jan's] request is to apply [Welfare and Institutions Code section] 15610.70[, subdivision] (a) to the contention Maria breached her fiduciary duty, and to the presumption of undue influence [under *Haines*] (Maria's burden). The court will assume that limitation avoids [California Rules of Court,] [r]ule 5.17.

> "Initially, the court questions whether elder abuse is a good fit to a case dissolving a marriage, a highly complex social and emotional relationship. The parties have not presented, nor has the court discovered a California appellate decision, published or not, applying [Welfare and Institutions Code section] 15610.70 to a [marital] dissolution. Importing elder abuse allegations could invade the careful balancing of rights and obligations in the Family Code and case law, which protect spouses adequately, irrespective of their age. That balance is easily undone by adding new obligations if one of the spouses is over 64.

> " . . . Nevertheless, the court will evaluate [Jan's] claims."

21

After summarizing the testimony of the parties' experts on the issue of undue influence, the court stated:

> "Maria did use affection, and initiated changes in property rights in haste. [Welfare and Institutions Code section] 15610.70[, subdivisions] (a)(3)(B) & (a)(3)(C). She did not isolate Jan, however, withhold information, prevent him from contacting Anna, or anyone else. Jan was free to come and go as he wished (he had a driver), and was not coerced or intimidated. *Maria did not use 'excessive persuasion,' nor did she in any sense overcome Jan's free will.*

> "Another factor is whether the transactions resulted in an inequity. [Welfare and Institutions Code section] 15610.70[, subdivision] (a)(4). There are two ways to view the equities in this case: From Maria's point of view, it is a windfall—she has benefited beyond what one would expect, even considering the three-year engagement and improvements she oversaw in Jan's company.

> "From Jan's point of view, he had been using his wealth as a catalyst in his relationship[s] with Maria and Anna for some time. The transfers to Maria had no effect whatsoever on his lifestyle and only a small effect [on] his wealth. He was plainly willing to risk that much money in the market for a gain, and he was willing to risk it for Maria's loyalty. One can see the same thing at work in Jan's relationship with Anna, albeit with different dynamics.

> " . . . [Jan] spent freely when he wanted something or when it made him feel good, including on Maria and Anna. Moreover, he plainly used his money to influence his relationships with both of them. . . . He appeared to view his marriage to Maria as a contract, and when he realized he was not going to be married any more, he wanted his consideration back, much as he did in 1992." (Italics added.)

The court stated: "Again, undue influence is defined by [Welfare and Institutions Code section] 15610.70[, subdivision] (a) as excessive persuasion that overcomes someone's free will and results in an inequity. But getting married is an agreement to surrender some of one's free will to another person, and society does not keep score of which spouse comes out ahead, but looks to whether the family unit is enhanced by their decisions. True, the court must step in at a dissolution to determinate disputed property issues, but the Family Code and case law provide the court and the parties with a step by step procedure for resolving those disputes. If Jan wanted Maria to be a happy, supportive and loving wife to him, and she persuaded him the way to do it was give her $10 million, which he could well afford, why should the court call it elder abuse—they both got what they wanted. After hearing eight weeks of testimony, the court believes he could have continued to be happy and content, but he became ruled by his doubts and insecurities." Accordingly, the court rejected Jan's claim that his transfers to Maria must be disallowed or invalidated for undue influence.

In the statement of decision's conclusion, the court stated that Jan was to recover $587,775 from Maria in disallowed transfers, payments, and option profits, and $273,554 in reallocated distributions, and that their TD Ameritrade joint account was to be assigned to Jan.

The court's judgment confirmed each party's separate property consistent with its statement of decision and concluded that Maria owed Jan a total amount of $861,329.

B

23

*EADACPA.*  Welfare and Institutions Code section 15610.70, subdivision (a) defines "undue influence" for purposes of the EADACPA, providing:

> " 'Undue influence' means excessive persuasion that causes another person to act or refrain from acting by overcoming that person's free will and results in inequity. In determining whether a result was produced by undue influence, all of the following shall be considered:

> "(1) The vulnerability of the victim.  Evidence of vulnerability may include, but is not limited to, incapacity, illness, disability, injury, age, education, impaired cognitive function, emotional distress, isolation, or dependency, and whether the influencer knew or should have known of the alleged victim's vulnerability.

> "(2) The influencer's apparent authority.  Evidence of apparent authority may include, but is not limited to, status as a fiduciary, family member, care provider, health care professional, legal professional, spiritual adviser, expert, or other qualification.

> "(3) The actions or tactics used by the influencer. Evidence of actions or tactics used may include, but is not limited to, all of the following:

> "(A) Controlling necessaries of life, medication, the victim's interactions with others, access to information, or sleep.

> "(B) Use of affection, intimidation, or coercion.

> "(C) Initiation of changes in personal or property rights, use of haste or secrecy in effecting those changes, effecting changes at inappropriate times and places, and claims of expertise in effecting changes.

> "(4) The equity of the result.  Evidence of the equity of the result may include, but is not limited to, the economic consequences to the victim, any divergence from

the victim's prior intent or course of conduct or dealing, the relationship of the value conveyed to the value of any services or consideration received, or the appropriateness of the change in light of the length and nature of the relationship." (Welf. & Inst. Code, § 15610.70, subd. (a).)

The EADACPA also provides that "[e]vidence of an inequitable result, without more, is not sufficient to prove undue influence." (Welf. & Inst. Code, § 15610.70, subd. (b).)

C

*Analysis.* Jan argues the trial court applied incorrect legal standards in determining whether certain interspousal transfers or transactions during his marriage to Maria were the result of her undue influence over him because the court purportedly did not consider and apply the factors set forth in Welfare and Institutions Code section 15610.70, subdivision (a).[10] However, as discussed *ante,* we presume on appeal that the trial court's decision is correct and, in so doing, we make all intendments and presumptions on matters to which the record is silent and resolve all

_____

[10] On July 12, 2019, Jan filed a motion requesting that we take judicial notice of a document filed by Maria on February 7, 2019, in a separate civil proceeding. Maria opposes his request for judicial notice. On August 2, 2019, Jan submitted for filing a reply brief in support of his request for judicial notice. We accept for filing Jan's reply brief, but deny his request for judicial notice. Absent exceptional circumstances, "[r]eviewing courts generally do not take judicial notice of evidence not presented to the trial court." (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3.) Because the document Jan requests that we judicially notice was not presented to the trial court and was, in fact, filed over one year after the judgment was entered in this case and we discern no exceptional circumstances that exist, we adhere to the general rule and deny Jan's request for judicial notice. (*Ibid.*; *Haworth v. Superior Court* (2010) 50 Cal.4th 372, 379, fn. 2; cf. *In re Marriage of Eustice* (2015) 242 Cal.App.4th 1291, 1300, fn. 3.)

ambiguities in favor of that decision. (*Arceneaux, supra*, 51 Cal.3d at p. 1133; *Denham, supra*, 2 Cal.3d at p. 564; *Winograd, supra*, 68 Cal.App.4th at p. 631.) The appellant has the burden on appeal to affirmatively show that the trial court erred. (*Denham*, at p. 564; *Fundamental Investment, supra*, 28 Cal.App.4th at p. 971.) Under that general rule of appellate review, we "must affirm the judgment if it can be supported on any legal theory, even if the trial court misapplied or misunderstood the law." (*Aguayo, supra*, 213 Cal.App.4th at p. 1115; see also *Rappleyea, supra*, 8 Cal.4th at pp. 980-981.) Accordingly, Jan has the burden to affirmatively show the court's judgment cannot be supported on any legal theory. Under the general rule, he cannot prevail on appeal by simply arguing or showing the court misapplied or misunderstood the law. Because Jan does not assert, or present any substantive analysis showing, that the court's judgment cannot be supported on any legal theory, we conclude he has not carried his burden on appeal to affirmatively show the court erred.[11] (*Denham*, at p. 564; *Fundamental Investment*, at p. 971; *Aguayo*, at p. 1115.)

Nevertheless, to the extent the above general rule does not apply to Jan's contention that the trial court incorrectly applied the law, we conclude he has not carried his burden on appeal to affirmatively show the court did, in fact, incorrectly apply the law on undue influence in marital dissolution

---

[11] For example, Jan does not assert or show that there is insufficient evidence to support the judgment.

26

proceedings.[12] Although Jan concedes that no statute requires, and no case has held, that Welfare and Institutions Code section 15610.70's definition of undue influence, or the factors listed therein, *must* be considered by a trial court in proceedings to divide marital property under the Family Code, he asks that we make such a pronouncement of law in disposing of his appeal. We decline to do so. First, the Legislature has not expressly provided that Welfare and Institutions Code section 15610.70's definition of undue influence applies to proceedings under the Family Code or, in particular, to section 721. If the Legislature had intended Welfare and Institutions Code section 15610.70's definition of undue influence to necessarily apply to section 721 or other determinations under the Family Code, it presumably would have expressly so provided. By comparison, we note that the Legislature expressly provided that Welfare and Institution Code section 15610.70's definition of "undue influence" applies to proceedings under the Probate Code. Probate Code section 86 provides: " 'Undue influence' has the same meaning as defined in Section 15610.70 of the Welfare and Institutions Code. It is the intent of the Legislature that this section supplement the common law meaning of undue influence without superseding or interfering with the

---

12    As discussed *ante*, there is a line of cases holding that the general rule of appellate review described *ante* does not apply where "the appellate focus is on the means used by the trial court" and it is asserted that an incorrect process led to the challenged judgment. (*Clothesrigger, Inc.*, *supra*, 191 Cal.App.3d at p. 611; see also, *Brinker Restaurant Corp.*, *supra*, 53 Cal.4th at pp. 1022, 1050; *Linder*, *supra*, 23 Cal.4th at pp. 435-436; *Ayala*, *supra*, 59 Cal.4th at p. 530; *Fuhrman*, *supra*, 16 Cal.4th at p. 944; *F.T.*, *supra*, 194 Cal.App.4th at p. 16.) Because those cases involved the scope or exercise of a trial court's discretion, which issues are not involved in this case, it is unclear to what extent this line of cases applies to our review of Jan's contentions on appeal. However, because we nevertheless elect to address the merits of his contentions, we need not, and do not, decide the novel question of law whether that line of cases necessarily applies to his contentions on appeal.

operation of that law." (See also, *Lintz*, *supra*, 222 Cal.App.4th at p. 1356, fn. 3 [noting that Prob. Code, § 86 was enacted together with Welf. & Inst. Code, § 15610.70, both of which were effective January 1, 2014].) Because the Legislature has not also so expressly provided that definition applies to Family Code proceedings, we presume the Legislature did *not* intend that Welfare and Institutions Code section 15610.70's definition of undue influence and/or the factors listed therein *necessarily* apply to a trial court's determination of undue influence or application of section 721 in marital dissolution proceedings under the Family Code. (Cf. Prob. Code, § 86; *People v. Arriaga* (2014) 58 Cal.4th 950, 960 ["It is a settled principle of statutory interpretation that if a statute contains a provision regarding one subject, that provision's omission in the same or another statute regarding a related subject is evidence of a different legislative intent."]; *Brown v. Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 725 ["If the Legislature had intended subdivision 3 [of Civ. Code, § 47] to apply to the news media as such or to communications on matters of public interest, the Legislature could have used the same clear language as in subdivisions 4 and 5 [of Civ. Code, § 47]."].) In *County of San Diego v. San Diego NORML* (2008) 165 Cal.App.4th 798, at page 825, we stated: "Where statutes involving similar issues contain language demonstrating the Legislature knows how to express its intent, ' "the omission of such provision from a similar statute concerning a related subject is significant to show that a different legislative intent existed with reference to the different statutes." ' " Accordingly, we decline to make the novel pronouncement suggested by Jan regarding the application of Welfare and Institutions Code section 15610.70 to proceedings under the Family Code.

Second, in any event, we need not make such a finding, because it is unnecessary to do so to dispose of this appeal. As we conclude *post*, the record supports a reasonable inference that the court considered *all* of the factors set forth in Welfare and Institutions Code section 15610.70, subdivision (a) and properly applied those factors, along with section 721, subdivision (b), *Haines*, and other applicable law, in determining whether Maria exercised undue influence over Jan in regard to the transfers or other transactions that he challenged at trial. Accordingly, although consideration of the factors listed in Welfare and Institutions Code section 15610.70 may assist a trial court in determining whether a marital transfer or transaction should be voided for undue influence under section 721, subdivision (a) and *Haines*, and therefore we believe a trial court *may* properly consider those factors, we decline to hold that a trial court *must* consider all of those factors in determining whether a transfer or transaction should be voided for undue influence in a marital dissolution proceeding under the Family Code. (*Costa Serena Owners Coalition v. Costa Serena Architectural Com.* (2009) 175 Cal.App.4th 1175, 1205-1206 [appellate court's duty is to decide actual controversies and not to give opinions on moot questions or abstract propositions or to declare principles or rules of law which cannot affect the matter in issue in the case before it].)

Addressing the merits of Jan's assertion, we conclude, contrary to his assertion, that the trial court did, in fact, consider the factors listed in Welfare and Institutions Code section 15610.70, subdivision (a) in determining whether Jan's transfers to Maria of cash and real property should be voided for undue influence. The court's statement of decision contains many references to, and discussions of, factors listed in that statute. In discussing the issue of undue influence, the court noted that Jan asked it

29

to find that Maria exercised undue influence over him as described by Welfare and Institutions Code section 15610.70, subdivision (a), which defines "undue influence" as excessive persuasion that overcomes a person's free will and results in inequity. Although the court questioned whether the EADACPA is a "good fit" in a marital dissolution proceeding and noted that no case had applied Welfare and Institutions Code section 15610.70 to a marital dissolution proceeding, the court "nevertheless" evaluated Jan's claims by considering that statute's listed factors. The court then expressly considered certain factors listed in that statute in light of the facts and circumstances in this case. In particular, the court stated:

> "Maria did use affection, and initiated changes in property rights in haste. [Welfare and Institutions Code section] 15610.70[, subdivisions] (a)(3)(B) & (a)(3)(C). She did not isolate Jan, however, withhold information, prevent him from contacting Anna, or anyone else. Jan was free to come and go as he wished (he had a driver), and was not coerced or intimidated. Maria did not use 'excessive persuasion,' nor did she in any sense overcome Jan's free will. [¶] Another factor is whether the transactions resulted in an inequity. [Welfare and Institutions Code section] 15610.70[, subdivision] (a)(4). There are two ways to view the equities in this case: From Maria's point of view, it is a windfall—she has benefited beyond what one would expect, even considering the three-year engagement and improvements she oversaw in Jan's company. [¶] From Jan's point of view, he had been using his wealth as a catalyst in his relationship[s] with Maria and Anna for some time. The transfers to Maria had no effect whatsoever on his lifestyle and only a small effect [on] his wealth. He was plainly willing to risk that much money in the market for a gain, and he was willing to risk it for Maria's loyalty. One can see the same thing at work in Jan's relationship with Anna, albeit with different dynamics. [¶] . . . [Jan] spent freely when he wanted something or when it made him feel good, including on Maria and Anna. Moreover, he plainly used his money to

30

> influence his relationships with both of them. . . . He appeared to view his marriage to Maria as a contract, and when he realized he was not going to be married any more, he wanted his consideration back, much as he did in 1992."

The court further stated: "Again, undue influence is defined by [Welfare and Institutions Code section] 15610.70[, subdivision] (a) as excessive persuasion that overcomes someone's free will and results in an inequity." After considering the factors in Welfare and Institutions Code section 15610.70, subdivision (a), as well as section 721, subdivision (b), *Haines* and other applicable law, the court rejected Jan's claim that his transfers to Maria must be disallowed or invalidated for undue influence.

Therefore, the record shows the trial court considered the factors listed in Welfare and Institutions Code section 15610.70, subdivision (a) in determining whether Jan's transfers to Maria of cash or property should be voided for undue influence. In so doing, the court expressly cited and considered the factors set forth in Welfare and Institutions Code, section 15610.70, subdivisions (a)(3)(B), (a)(3)(C), and (a)(4). Although Jan notes the court's statement of decision did not expressly cite or discuss certain factors listed in that statute, the omission of any express citation to, or discussion of, those factors does not show the court did not consider or apply them in determining whether Jan's transfers to Maria of cash or real property should be voided for undue influence. In particular, Jan argues the court erred because its statement of decision did not make any findings regarding: (1) his "vulnerability" (Welf. & Inst. Code, § 15610.70, subd. (a)(1)); (2) Maria's "authority" (Welf. & Inst. Code, § 15610.70, subd. (a)(2)); and (3) her control over "the necessaries of life" (Welf. & Inst. Code § 15610.70, subd. (a)(3)(A)). To the extent Jan argues that the court should have discussed those specific factors and made findings as to their applicability, we conclude that because

31

he did not request any such specific findings in objecting to Maria's proposed statement of decision or by not objecting to the court's statement of decision, he has waived or forfeited any challenge to the statement of decision based on that purported deficiency.[13] (See, Code Civ. Proc., § 634; *Arceneaux*, *supra*, 51 Cal.3d at pp. 1132-1134 [if appellant does not inform trial court of alleged deficiencies in its statement of decision, appeal based on those deficiencies is waived on appeal]; *In re Marriage of Fossum* (2011) 192 Cal.App.4th 336, 346 [because appellant did not object to proposed statement of decision for failure to address or decide specific issue, appellant "forfeited his right to complain on appeal about the trial court's lack of specificity"]; *Rebney v. Wells Fargo Bank* (1991) 232 Cal.App.3d 1344, 1350 ["Having failed to give the trial court an opportunity to correct the claimed defects in the statement of decision, [appellant] cannot fairly be permitted to complain of them now."].)

*Schulz v. Jeppesen Sanderson, Inc.* (2018) 27 Cal.App.th 1167, cited by Jan in his reply brief as contrary authority, is inapposite to this case and does not persuade us to reach a contrary result. In *Schulz*, the trial court clearly stated its reasoning in its statement of decision and omitted any reference to required factors. (*Id.* at p. 1179.) Accordingly, *Schulz* concluded: "The only inference to be drawn from the court's failure to discuss the [required] factors . . . in its statement of decision is that the court found those factors unimportant . . . ." (*Id.* at pp. 1179-1180.) Unlike *Schulz*, we conclude that the court's failure to discuss in its statement of decision the three factors

---

13    In objecting to Maria's proposed statement of decision, Jan did not object based on its failure to include specific findings on those three factors. Likewise, after the trial court issued its statement of decision after considering each of the parties' prospective statements of decision and their respective objections thereto and without first issuing its own proposed statement of decision, Jan did not object to the court's statement of decision based on its failure to make specific findings on those factors.

cited by Jan does *not* necessarily require an inference that the court found those factors inapplicable or unimportant. Rather, as discussed *post*, applicable law requires that we infer the court did, in fact, consider and apply those factors. Furthermore, to the extent *Schulz* suggests that a trial court's statement of decision must identify and address each and every factor involved in its determination of an ultimate issue, we disagree and decline to apply such a rule to this case. In any event, Jan's reply brief clarifies that he is challenging the judgment not based on omissions in the court's statement of decision, but instead based on the court's purported substantive error in applying incorrect legal standards. As discussed *post*, we dispose of his appeal based on our conclusion the court correctly applied the law in deciding Jan's challenged transfers to Maria were not affected by undue influence or his incapacity.

Importantly, assuming arguendo Jan has not waived or forfeited any challenge to the court's reasoning or application of legal standards, because we make all presumptions in favor of the judgment and imply findings in support of the judgment, we infer that the court did, in fact, consider *all* of the factors listed in Welfare and Institutions Code section 15610.70, subdivision (a), including the three factors that Jan asserts it disregarded, in making its determination on the issue of undue influence. (*Arceneaux, supra*, 51 Cal.3d at p. 1133; *Denham, supra*, 2 Cal.3d at p. 564; *Winograd, supra*, 68 Cal.App.4th at p. 631; *SFPP v. Burlington Northern & Santa Fe Ry. Co.* (2004) 121 Cal.App.4th 452, 462 (*SFPP*); *Gorman v. Tassajara Development Corp.* (2009) 178 Cal.App.4th 44, 60 (*Gorman*).) As discussed *ante*, on appeal we presume the trial court "performed its duties in a regular and correct manner absent a clear showing to the contrary." (*Fransen, supra*, 142 Cal.App.3d at p. 424; see also *Smith, supra*, 225 Cal.App.3d at p. 494.) In so

33

doing, we "*presume*[] *that the court followed the law.*" (*Wilson, supra*, 34 Cal.3d at p. 563, italics added.) "The mere fact that the court did not explicitly refer to [an applicable rule or the factors listed therein] . . . does not support the conclusion that it was ignored." (*Ibid.*; see also *San Ramon Valley, supra*, 175 Cal.App.3d at p. 1056; *Dubois, supra*, 12 Cal.App.4th at p. 1696 ["[T]he court is presumed to be correct in its ruling and need not specifically state that it has considered all of the relevant factors enunciated in the rule. . . ."].) Unless a statute or rule requires express findings, "*we presume the court followed the law in making its determination* [citation], *including a consideration of the criteria* set forth in [an applicable statute or rule]." (*Landry, supra*, 39 Cal.App.4th at pp. 698-699, italics added; see also, *Dubois*, at pp. 1698-1699.) Accordingly, based on our review of the record in this case, we presume the trial court considered all of the factors listed in Welfare and Institutions Code section 15610.70, subdivision (a) in determining whether Maria exercised undue influence over Jan. The record does not affirmatively show, or support a reasonable inference, that the court ignored any of those listed factors. Instead, the record supports the reasonable inference that the court considered all of those factors, along with section 721, subdivision (b), *Haines*, and other applicable law, in determining whether Maria exercised undue influence over Jan. Furthermore, Jan has not cited to anything in the record that affirmatively shows the court misunderstood or did not apply the factors listed in Welfare and Institutions Code section 15610.70, subdivision (a). Therefore, we conclude Jan has not carried his burden on appeal to affirmatively show the court did not consider and apply those factors in determining whether Maria exercised undue influence over him. (*Denham, supra*, 2 Cal.3d at p. 564; *Fundamental Investment, supra*, 28 Cal.App.4th at p. 971.)

34

Contrary to Jan's assertion, we conclude the court properly considered and applied the factors listed in Welfare and Institutions Code section 15610.70, subdivision (a) despite its statement that it questioned whether the EADACPA is a good fit in a marital dissolution proceeding, noting that consideration of elder abuse allegations "could invade the careful balancing" of rights and obligations under the Family Code and related case law. After making that observation, the court stated that it "[n]evertheless" would evaluate Jan's claim of undue influence by considering the factors listed in Welfare and Institutions Code section 15610.70, subdivision (a), as he suggested. Therefore, we conclude the record shows the court's analysis of those factors was not "colored," as Jan asserts, by its concern that the EADACPA is not a good fit in marital dissolution proceedings under the Family Code.

We also reject Jan's assertion that the court improperly considered his wealth in determining whether Maria unduly influenced him. As Maria argues, the court properly considered Jan's wealth in evaluating the "equity" of his transfers, which factor is listed in Welfare and Institutions Code section 15610.70, subdivision (a)(4). Because that factor includes "the economic consequences to the victim," the court reasonably considered Jan's wealth in weighing the economic consequences to him of his transfers to Maria. (Welf. & Inst. Code, § 15610.70, subd. (a)(4).)

We also reject Jan's assertion that the court improperly considered intangible benefits that Maria provided to him, such as love and care which are implicit in a marriage, in determining whether she exercised undue influence over him. Citing the court's observation that "they both got what they wanted" (e.g., Jan got "a happy, supportive and loving wife"), Jan argues the court erred in its consideration of undue influence factors. However, he

35

does not cite any case holding that a court cannot consider intangible benefits provided by a spouse in determining whether that spouse exercised undue influence over the other spouse. *Burkle*, *supra*, 139 Cal.App.4th 712, cited by Jan, does not so hold. Rather, the language from *Burkle* cited by Jan addresses only the reason for the rebuttable presumption of undue influence and does *not* hold that intangible benefits cannot be considered. (*Id.* at p. 731 ["Cases . . . involving property transfers without consideration[] necessarily raise a presumption of undue influence, because one spouse obtains a benefit at the expense of the other, who receives nothing in return."].) In determining whether a transfer should be voided for undue influence, a court should consider all of the facts and circumstances of the parties' relationship and the challenged transfer, and the court here properly considered intangible benefits provided by Maria as among those facts and circumstances in deciding the issue of undue influence. (Cf. *Lintz*, *supra*, 222 Cal.App.4th at p. 1355.) In any event, we conclude the record does not support Jan's apparent assertion that the court found Maria did not unduly influence him (i.e., that it "exonerated" her) based solely or primarily on the love and care she provided him. Rather, as we concluded *ante*, the record shows the court made that finding based on its proper consideration of all of the relevant factors set forth in Welfare and Institutions Code section 11560.70, subdivision (a), Family Code section 721, subdivision (b), *Haines* and other applicable law, in the context of all of the facts and circumstances of Jan's and Maria's relationship. (*Lintz*, at p. 1355.) Therefore, in the circumstances of this case, we conclude the court did not err by considering, inter alia, intangible benefits provided by Maria to Jan.

In a related argument, Jan asserts the court erred by focusing on each individual transfer in determining whether Maria exercised undue influence

36

over him and by not considering all of the facts and circumstances of their relationship and the challenged transfers as a whole. However, the record does not support that assertion. Rather, the record shows the court properly considered each challenged transfer by Jan to Maria in determining whether that particular transfer should be voided for undue influence, and, in so doing, the court considered all of the facts and circumstances of their relationship and the transfers as a whole. (Cf. *Lintz, supra,* 222 Cal.App.4th at p. 1355.) To the extent Jan argues that the challenged transfers cannot be considered individually for undue influence in light of all of the facts and circumstances and must instead be either voided or confirmed in their entirety, he does not cite any case so holding and we are not persuaded by that argument. Where, as in this case, transfers are made over a period of time during a marriage, the factors related to the issue of undue influence may change or fluctuate during that period such that any alleged undue influence should generally be evaluated as to each individual transfer, while considering all of the facts and circumstances of the marital relationship and all transfers. (Cf. § 852, subd. (a) [for valid transmutation of specific property, express declaration in writing is required stating characterization or ownership of that property is being changed]; *Valli, supra,* 58 Cal.4th at p. 1400 [same]; *Estate of Bibb* (2001) 87 Cal.App.4th 461, 469, 471 [evaluated transfers of real property and vehicle individually in deciding whether each transfer was a valid transmutation].) Accordingly, contrary to Jan's assertion, we conclude the court correctly understood and applied the law in determining his challenged transfers to Maria were not the result of undue influence.[14]

---

14    Because Jan does not argue on appeal that the court erred by considering and applying Family Code section 721, subdivision (b), *Haines*

IV

*Trial Court Correctly Applied the Law on Capacity*

Jan asserts the trial court applied incorrect legal standards in determining whether certain interspousal transfers or transactions during his marriage to Maria were the result of his incapacity, arguing, in a conclusory manner, that the court failed to consider Probate Code section 812 and Civil Code section 39, as those statutes were interpreted in *In re Marriage of Greenway* (2013) 217 Cal.App.4th 628 (*Greenway*). As stated *ante*, Jan does *not* assert there is insufficient evidence to support the court's findings. Based on our review of the court's statement of decision, we conclude he has not carried his burden on appeal to show the court so erred.

A

*Law*. Probate Code section 810, subdivision (a) provides that there is a rebuttable presumption that "all persons have the capacity to make decisions and to be responsible for their acts or decisions." Probate Code section 810, subdivision (c) provides: "A judicial determination that a person is totally without understanding or is of unsound mind or suffers from one or more mental deficits so substantial that, under the circumstances, the person should be deemed to lack the legal capacity to perform a specific act, should be based on evidence of a deficit in one or more of the person's mental functions rather than on a diagnosis of a person's mental or physical disorder."

Probate Code section 811, subdivision (a), as extensively discussed in the court's statement of decision, provides: "A determination that a person is

___

and related case law, and Civil Code section 1575, in determining whether his challenged transfers to Maria should be voided for undue influence, we need not, and do not, address or discuss those other sources of applicable law or the court's consideration of that applicable law.

of unsound mind or lacks the capacity to make a decision or do a certain act, including, but not limited to, the incapacity to contract, to make a conveyance, [or] to marry, . . . shall be supported by evidence of a deficit in at least one of the following mental functions . . . . :  [¶]  (1) Alertness and attention . . . . ;  [¶]  (2) Information and processing . . . . ; (3) Thought processes . . . . ;  [¶]  and (4) Ability to modulate mood and affect . . . ." Probate Code section 811, subdivision (b) provides:  "A deficit in the mental functions listed above may be considered only if the deficit, by itself or in combination with one or more other mental function deficits, significantly impairs the person's ability to understand and appreciate the consequences of his or her actions with regard to the type of act or decision in question."

Probate Code section 812 provides:  "Except as where otherwise provided by law . . . . , a person lacks the capacity to make a decision unless the person has the ability to communicate verbally, or by any other means, the decision, and to understand and appreciate, to the extent relevant, all of the following:  [¶]  (a) The rights, duties, and responsibilities created by, or affected by[,] the decision[;]  [¶]  (b) The probable consequences for the decisionmaker and, where appropriate, the persons affected by the decision[;] [¶]  [and] (c) The significant risks, benefits, and reasonable alternatives involved in the decision."

Civil Code section 39 provides:  "(a) A conveyance or other contract of a person of unsound mind, but not entirely without understanding, made before the incapacity of the person has been judicially determined, is subject to rescission . . . .  [¶]  (b) A rebuttable presumption affecting the burden of proof that a person is of unsound mind shall exist for purposes of this section if the person is substantially unable to manage his or her own financial resources or resist fraud or undue influence. . . ."

*Greenway* stated: "[T]he determination of a person's mental capacity is fact specific, and the level of required mental capacity changes depending on the issue at hand. . . . After reviewing relevant case law, we conclude mental capacity can be measured on a sliding scale, with marital capacity requiring the least amount of capacity, followed by testamentary capacity, and on the high end of the scale is the mental capacity required to enter [into] contracts. The burden of proof on mental capacity changes depending on the issue; there is a presumption in favor of the person seeking to marry or devise a will, but not so in the context of a person executing a contract." (*Greenway*, *supra*, 217 Cal.App.4th at p. 639.) *Greenway* stated: "The basic starting point for any mental capacity determination is the Due Process in Competence Determinations Act found in Probate Code sections 810 to 813 . . . ." (*Greenway*, at p. 640.) After discussing Probate Code sections 810 and 811, *Greenway* stated: "Probate Code section 812 provides additional criteria to be considered when deciding whether a person lacks 'capacity to make decision[s].' " (*Greenway*, at p. 640.) The court then quoted Probate Code section 812's language in its entirety. (*Greenway*, at pp. 640-641.) *Greenway* also noted that Civil Code section 39, subdivision (b) "provides more specific guidelines for determining the capacity to contract" than Probate Code sections 811 and 812. (*Greenway*, at p. 642.) The court then quoted the language of Civil Code section 39, subdivision (b). (*Ibid*.) *Greenway* stated: "If the Civil Code section 39, subdivision (b) presumption arises, the burden is placed on the party claiming capacity to contract to prove that while he or she may be unable to manage his or her financial resources or resist fraud or undue influence, he or she is nevertheless still capable of contracting being of sound mind as defined by Probate Code section 811." (*Greenway*, at pp. 642-643.)

## B

*Statement of decision.* In its statement of decision, the court addressed the issue of Jan's capacity, stating that it was guided by "some dictum" in *Greenway* "discussing the necessary capacity to make gifts, create a trust and grant a power of attorney, which are higher than some others, such as capacity to marry or make a will. [Citation.]" The court then stated: "The *Greenway* court referred to *Probate Code* [section] 811 and [section] 812, which provide a list of factors, and states the burden to prove it is on the party attacking capacity." (Italics added.) After setting forth the factors listed in Probate Code section 811, the court stated: "[W]itnesses who interacted with Jan throughout 2013 uniformly agreed he met the criteria listed in [Probate Code section] 811 for competency [i.e., capacity]. He was making rational trades in the stock market (rational given the risk he was willing to assume), was organized, alert and his moods were appropriate to the situation." The court then noted that although Dr. Bennett Blum, Jan's psychiatrist expert witness, testified that Jan had impaired executive functioning throughout his marriage to Maria, the witnesses who interacted with Jan after his stroke disagreed. Furthermore, the court noted Dr. James E. Spar, Maria's psychiatrist expert witness, testified that Jan had decisional capacity throughout the marriage, but offered no opinion on his functional capacity. Dr. Spar also testified that Jan was moderately susceptible to Maria's and Anna's influence throughout the marriage. Expressly considering the factors listed in Probate Code section 811 and weighing the evidence at trial, the court found Jan had failed to prove he lacked the capacity to make the challenged transfers to Maria.

Regarding Jan's allegation that his transfers to Maria were invalid because he lacked functional capacity (or executive functioning) which

41

involves high-level cognitive functions such as creative and abstract thought, the court noted in its statement of decision that neither the Probate Code nor *Greenway* addressed the distinction between decisional and functional capacity. The court stated: "Nevertheless, one interpretation of *Haines* is the transmuting spouse must have a complete understanding of the long-term effects of the transfer, which implicates functional or executive capacity. . . . [U]nder *Haines* the burden is now on Maria to prove Jan did have the capacity to keep his long-term best interest in mind." Regardless whether Maria was required to merely show Jan had decisional capacity under Probate Code section 810 or "a higher level of functioning," the court found that "Maria has met the heavier burden as well." The court concluded: "[T]he weight of the evidence is Jan's executive functioning was adequate during 2013 to understand his actions [and] appreciate the long-term consequences [of his transfers to Maria]."

C

*Analysis.* Contrary to Jan's assertion, we conclude the record shows the court was aware of and considered the provisions of Probate Code section 812 in determining that Jan had the requisite capacity to make the challenged transfers to Maria. As noted *ante*, the court's statement of decision expressly referred to *Greenway*, stating: "The *Greenway* court referred to Probate Code [section] 811 and [section] 812, which provide a list of factors, and states the burden to prove it is on the party attacking capacity." Based on that statement, we infer the court not only read *Greenway* and considered the general principles discussed therein regarding capacity determinations, but also considered the specific provisions of Probate Code section 812, which were referred to and quoted in *Greenway*. As discussed *ante*, *Greenway* stated: "Probate Code section 812 provides

42

additional criteria to be considered when deciding whether a person lacks 'capacity to make decision[s].' " (*Greenway, supra*, 217 Cal.App.4th at p. 640.) *Greenway* then quoted Probate Code section 812's language in full. (*Greenway*, at pp. 640-641.)  Based on our review of the express language in the court's statement of decision, we conclude the record affirmatively shows the court was, in fact, aware of Probate Code section 812's provisions and, based thereon, we presume the court considered and applied Probate Code section 812's provisions in determining Jan had the capacity to make the challenged transfers to Maria.  Because, as discussed *ante*, we make all presumptions in favor of the judgment and imply findings in support of the judgment, we infer that the court did, in fact, consider the provisions of Probate Code section 812 in making its determination on the issue of Jan's capacity.  (*Arceneaux, supra*, 51 Cal.3d at p. 1133; *Denham, supra*, 2 Cal.3d at p. 564; *Winograd, supra*, 68 Cal.App.4th at p. 631; *SFPP, supra*, 121 Cal.App.4th at p. 462; *Gorman, supra*, 178 Cal.App.4th at p. 60.)  In particular, we presume that court followed the law and properly considered all applicable factors or criteria.  (*Wilson, supra*, 34 Cal.3d at p. 563; *San Ramon Valley, supra*, 175 Cal.App.3d at p. 1056; *Dubois, supra*, 12 Cal.App.4th at p. 1696; *Landry, supra*, 39 Cal.App.4th at pp. 698-699.)  Jan has not carried his burden on appeal to affirmatively show otherwise. (*Arceneaux*, at p. 1133; *Denham*, at p. 564.)

Likewise, contrary to Jan's assertion, we conclude the record shows the court was aware of and considered the provisions of Civil Code section 39 in determining that Jan had the requisite capacity to make the challenged transfers to Maria.  In its statement of decision, the court expressly referred to *Greenway* twice, indicating that it had read and considered *Greenway*'s reasoning and the principles discussed therein in determining whether Jan

had the capacity to make the challenged transfers.  As discussed *ante*, *Greenway* stated that Civil Code section 39, subdivision (b) "provides more specific guidelines for determining the capacity to contract" than Probate Code sections 811 and 812 and then quoted the language of Civil Code section 39, subdivision (b).  (*Greenway*, *supra*, 217 Cal.App.4th at p. 642.)  *Greenway* stated:  "If the Civil Code section 39, subdivision (b) presumption arises, the burden is placed on the party claiming capacity to contract to prove that while he or she may be unable to manage his or her financial resources or resist fraud or undue influence, he or she is nevertheless still capable of contracting being of sound mind as defined by Probate Code section 811." (*Greenway*, at pp. 642-643.)  Based on our review of the court's statement of decision, which includes two references to *Greenway*, we conclude the court was aware of and considered *Greenway*'s reasoning, including its discussion and quotation of Civil Code section 39, subdivision (b).  Based thereon, we conclude the record affirmatively shows the court was, in fact, aware of Civil Code section 39's provisions and therefore we presume the court considered and applied Civil Code section 39's provisions in determining Jan had the capacity to make the challenged transfers to Maria.  Because, as discussed *ante*, we make all presumptions in favor of the judgment and imply findings in support of the judgment, we infer that the court did, in fact, consider the provisions of Civil Code section 39 in making its determination on the issue of Jan's capacity.  (*Arceneaux*, *supra*, 51 Cal.3d at p. 1133; *Denham*, *supra*, 2 Cal.3d at p. 564; *Winograd*, *supra*, 68 Cal.App.4th at p. 631; *SFPP*, *supra*, 121 Cal.App.4th at p. 462; *Gorman*, *supra*, 178 Cal.App.4th at p. 60.)  In particular, we presume that court followed the law and properly considered all applicable factors or criteria.  (*Wilson*, *supra*, 34 Cal.3d at p. 563; *San Ramon Valley*, *supra*, 175 Cal.App.3d at p. 1056; *Dubois*, *supra*, 12

Cal.App.4th at p. 1696; *Landry, supra,* 39 Cal.App.4th at pp. 698-699.) Accordingly, we conclude the trial court correctly considered and applied the law in determining that Jan had the requisite capacity to make the challenged transfers to Maria. Jan has not carried his burden on appeal to affirmatively show otherwise.[15] (*Arceneaux,* at p. 1133; *Denham,* at p. 564.)

DISPOSITION

The judgment is affirmed.

---

[15] Because we conclude the court considered and applied Probate Code 812 and Civil Code 39 in determining that Jan had the requisite capacity to make the challenged transfers to Maria, we need not, and do not, address Jan's argument regarding the prejudicial effect of the court's purported failure to consider those statutes or his related discussion of *Archdale v. American Internat. Specialty Lines Ins. Co.* (2007) 154 Cal.App.4th 449.

BENKE, Acting P. J.

WE CONCUR:


O'ROURKE, J.


IRION, J.